# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3599

GARY L. BRANHAM,

*Plaintiff-Appellant*,

v.

JOHN W. SNOW, Secretary, United States
Department of Treasury/Internal
Revenue Service,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 01 C 152—**John Daniel Tinder**, *Judge.*

———————

ARGUED JUNE 10, 2004—DECIDED DECEMBER 17, 2004

———————

Before CUDAHY, RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Gary L. Branham brought this action
under the Rehabilitation Act of 1973 ("Rehabilitation Act"
or "the Act"), 29 U.S.C. § 701 et seq., against his employer,
the Internal Revenue Service ("IRS"), for failing to hire him
as a Criminal Investigator in its Criminal Investigation
Division. The district court granted the IRS' motion for
summary judgment on the ground that Mr. Branham was
not disabled for purposes of the Rehabilitation Act. For the

reasons set forth in the following opinion, we now reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Mr. Branham has Type I insulin-dependent diabetes, a noncurable metabolic condition characterized by elevated blood sugar (hyperglycemia). Type I diabetics use insulin to lower their blood sugar levels (the long term effects of chronically elevated blood sugar include heart disease, kidney disease, nerve disease and blindness). However, excessive use of insulin may cause too much sugar to leave the bloodstream, leading to abnormally low blood sugar levels (hypoglycemia). A person with mild to moderate hypoglycemia may experience symptoms including tremors, sweating, irritability, confusion and drowsiness. Eating simple carbohydrates will raise the blood sugar level in an individual with mild to moderate hypoglycemia. Severe hypoglycemia may lead to unconsciousness and convulsions and can be life-threatening.

In order to keep his blood sugar at an appropriate level, Mr. Branham follows a treatment regimen formulated by his physician, Dr. Paul Skierczynski. Mr. Branham must check his blood sugar level four to five times a day. He controls his blood sugar through the use of insulin[1] and through diet

---

[1] Mr. Branham used to give himself insulin injections to control his blood sugar; since the commencement of this case, he has started utilizing an insulin pump. When the case was filed, he
(continued...)

and exercise. The readings produced by Mr. Branham's blood sugar tests dictate the amount of insulin that he must administer, as well as when and what type and amount of food he can eat. It is possible for Mr. Branham to skip or delay meals on occasion.

Although Mr. Branham never has experienced a severe hyperglycemic or hypoglycemic reaction, approximately once every three weeks he does suffer from minor reactions to low blood sugar, including trembling and sweating. At all times, Mr. Branham keeps with him additional insulin and a certain amount of carbohydrates, for use in the event his blood sugar level falls below an acceptable level.

Mr. Branham has worked for the IRS as a revenue agent since 1986. In 1998, he applied for the position of criminal investigator. The qualification standards for the position of "Criminal Investigator—Treasury Enforcement Agent" include requirements for undergraduate and graduate education and work experience. There are further requirements with respect to motor vehicle operation, use of firearms and maximum entry age. Most pertinently, the standards establish general and particular medical requirements. Specifically, the standards clearly state that "these positions require moderate to arduous physical exertion involving walking and standing, use of firearms, and exposure to inclement weather." R.45, Attachment C-2 at 18. A paragraph on "Special Medical Requirements" directs that "[s]ince the duties of these positions are exacting and involve the responsibility for the safety of others under trying conditions . . . [a]ny condition that would hinder full, efficient

---

[1] (...continued)
was giving himself four injections a day, which his physician, Dr. Skierczynski, characterized as "intensive treatment." R.54, Ex.D at 3 ¶ 6.

performance of the duties of these positions or that would cause the individual to be a hazard to himself/herself or to others is disqualifying." *Id.*

The qualification standards point out that "[a]ppointment will be contingent upon a candidate's passing a pre-employment medical examination . . . to ascertain possession of the physical and emotional requirements for the position." *Id.* Likewise, "[a]ny chronic disease or condition affecting the . . . endocrine . . . system[ ] that would impair full performance of the duties of the position is disqualifying." *Id.* at 19.

In March 1999, Mr. Branham was notified by letter of his "*tentative selection*" for the position of criminal investigator, "pending the satisfactory outcome of [a] . . . physical examination."[2] R.45, Attachment C-4 (emphasis in original). After Mr. Branham was given a physical exam, Dr. Richard J. Miller, the Director of Federal Law Enforcement Programs and Federal Occupational Health, concluded that Mr. Branham was not medically qualified for the position of criminal investigator. After reviewing Mr. Branham's medical history, the results of his medical examination and the report of his private physician, Dr. Miller determined that Mr. Branham could not perform the essential functions of the position with or without reasonable accommodation. R.45, Attachment C-10. Dr. Miller noted that the job "requires the ability to work irregular hours, respond to unanticipated requests, and react in a timely and appropriate manner in an emergency or crisis." *Id.* He opined that, if Mr. Branham performed "essential job functions of a Special

---

[2] Mr. Branham's own physician concluded that Mr. Branham could perform the duties of a criminal investigator. R.53, Ex.4 at 4.

Agent in the environment that these functions are generally performed," Mr. Branham likely would suffer "subtle and/or sudden incapacitation," which "would place the applicant and others (other Special Agents, the public) at an extreme risk of safety that would be unacceptable." *Id.*

In June 1999, Mr. Branham received a letter from the IRS informing him that he was "medically disqualified for the position of Criminal Investigator." R.45, Attachment C-11 at 1. According to the letter, the IRS had determined that Mr. Branham could not "perform the essential functions of the job . . . with or without accommodation." *Id.* The letter further explained that

> [t]he position requires the ability to work irregular hours, respond to unanticipated requests and react in a timely and appropriate manner to an emergency or crisis. Subtle and/or sudden incapacitation would place the applicant and others (other Special Agents, the public) at an extreme risk of safety and would be unacceptable.

*Id.* After the IRS notified Mr. Branham of its decision, he unsuccessfully pursued an administrative appeal. He later brought this action under the Rehabilitation Act.

## B. District Court Proceedings

Before the district court, the IRS sought summary judgment against Mr. Branham. The IRS took the position that Mr. Branham was not disabled under the Rehabilitation Act. In the alternative, the IRS submitted that Mr. Branham was not qualified for the position of criminal investigator because he could not perform the essential functions of the job without creating a safety threat to himself or others. Mr. Branham moved for partial summary judgment against the

IRS. He submitted that the IRS had failed to prove that he presented a direct threat to his own safety or that of others.

The district court determined that Mr. Branham was not disabled for purposes of the Rehabilitation Act and granted summary judgment to the IRS.[3] Specifically, the court found that Mr. Branham's diabetes, although constituting a physical impairment, does not substantially limit him in the major life activities of eating and caring for himself because he can "take care of himself, although by dint of greater effort than would be required of a non-diabetic," and because there is "no restraint on his physical activities and he exercises regularly." R.68 at 15. The district court distinguished this court's decision in *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916 (7th Cir. 2001), on the grounds that Mr. Branham's own physician had found that Mr. Branham had very good control of his diabetes, whereas Lawson had been unable properly to control his blood sugar; as well, Mr. Branham had shown himself capable of continued employment, while Lawson's diabetes for several years had rendered him unable to maintain employment. The district court also distinguished this court's decision in *Nawrot v. CPC International*, 277 F.3d 896 (7th Cir. 2002), on the ground that Mr. Branham's symptoms were much less severe than those experienced by the diabetic plaintiff in that case.

---

[3] The court noted that Mr. Branham faced a "double-bind":

> On the one hand, in order to qualify as disabled under the Rehabilitation Act, the Plaintiff emphasizes those portions of the record, . . . which tend to show the gravity of his condition; but to demonstrate that he is nonetheless medically qualified and does not present a threat of harm, he does a 180-degree turn and points to . . . his diabetes as being under excellent control.

R.68 at 10-11.

The district court also held that Mr. Branham was not disabled for purposes of the Rehabilitation Act because the IRS had not regarded him as disabled. The court found that Dr. Miller did not believe Mr. Branham was substantially limited in any major life activities.

## II

## ANALYSIS

### A. Standard of Review

We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to Mr. Branham, the nonmoving party. *Lawson*, 245 F.3d at 922. Summary judgment will be affirmed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment "will not be sustained if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lawson*, 245 F.3d at 922 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

### B. Rehabilitation Act Framework

The Rehabilitation Act protects a "qualified individual with a disability" from discrimination solely because of his disability in any program receiving federal financial assistance. 29 U.S.C. § 794(a). To make out a prima facie case under the Act, the plaintiff must show: that he "suffers from a disability as defined under the Act; that he was otherwise qualified for the job; that he was involved in programs receiving federal financial assistance; and that he was excluded from participation, denied benefits, or otherwise

discriminated against solely because of his disability." *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). On this appeal, we are concerned with the questions of whether Mr. Branham is "an individual with a disability" within the meaning of the Act and whether he is "qualified" for the employment position he seeks.

The Rehabilitation Act defines an individual with a disability as "any person who (i) has a mental or physical impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The Rehabilitation Act provides that the standards of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 et seq., are to be used in determining whether the Rehabilitation Act has been violated in the employment context. 29 U.S.C. § 794(d); *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002); *Silk*, 194 F.3d at 798 n.7. Thus, we refer to the provisions and standards of the ADA in determining whether there has been a violation of the Rehabilitation Act in this context. An individual with a disability is qualified if he "can perform the essential functions of the employment position that such individual holds or desires," with or without reasonable accommodation. 42 U.S.C. § 12111(8).

## C. An Individual with a Disability

Mr. Branham contends that, on this record, there is a genuine issue of triable fact as to whether he should be considered an individual with a disability under the Rehabilitation Act because his diabetes is a physical impairment that substantially limits the major life activities of eating and caring for himself. *See* 29 U.S.C. § 705(20)(B)(i). He also claims that he is an individual with a disability under the

Act because the IRS regarded him as having such an impairment. *See* 29 U.S.C. § 705(20)(B)(iii).

### 1.

We first consider the applicability of § 705(20)(B)(i). The parties agree that diabetes is a physical impairment and that eating and caring for oneself are major life activities. *See Lawson*, 245 F.3d at 923. Therefore, the only question is whether Mr. Branham's diabetes substantially limits one of these activities.

For an impairment to limit substantially a major life activity, "the impairment must make the individual '[u]nable to perform a major life activity that the average person in the general population can perform' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person.' " *Nawrot*, 277 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)). An impairment need not cause an "utter inabilit[y]" to perform the major life activity in order to constitute a substantial limitation on that activity. *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998).

The determination whether a particular person with an impairment is substantially limited must be individualized; in other words, we may not declare that all individuals who suffer from a particular medical condition are disabled for the purposes of the Rehabilitation Act. *See Sutton v. United Air Lines*, 527 U.S. 471, 483-84 (1999). Underlining the specificity that is required in making an individualized determination of disability, the Supreme Court has noted that it would be contrary to the language of the ADA to find "all diabetics to be disabled," regardless of whether an individual diabetic's condition actually impaired his daily

activities. *Id.* at 483. Thus, we emphasize that, even though this court has determined on two separate occasions that a person with Type I diabetes can be substantially limited with respect to one or more major life activities, *see Nawrot*, 277 F.3d at 905; *Lawson*, 245 F.3d at 926, neither of those cases dictates the outcome here. To hold otherwise would be to contravene the Supreme Court's determination that "both the letter and the spirit" of the ADA require an individualized assessment of each plaintiff's "actual condition," rather than a "determination based on general information about how an uncorrected impairment usually affects individuals." *Sutton*, 527 U.S. at 483.

Furthermore, we emphasize that our holding in this case does not affect the principle that "diabetic status, per se, is not sufficient to qualify as a disability." *Nawrot*, 277 F.3d 904; *see also Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 (7th Cir. 1996) ("Some impairments may be disabling for particular individuals but not for others . . . ."). For example, a " 'diabetic whose illness does not impair his or her daily activities,' after utilizing medical remedies such as insulin, should not be considered disabled." *Lawson*, 245 F.3d at 926 (quoting *Sutton*, 527 U.S. at 483). An individualized inquiry into each plaintiff's condition remains the rule in cases under the Rehabilitation Act and the ADA.

In this case, it is undisputed that Mr. Branham's treatment regimen allows him to avoid severe hypoglycemic and hyperglycemic episodes, and protects him from the long term consequences of Type I diabetes (which include heart disease, kidney disease, nerve disease and blindness). However, that is in no way dispositive of our analysis, because "[t]he use . . . of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting."

*Sutton*, 527 U.S. at 488 (emphasis in original). A court determining whether a plaintiff's impairment substantially limits a major life activity must consider "the plaintiff's condition as it exists after corrective or mitigating measures used to combat the impairment." *Lawson*, 245 F.3d at 925. Therefore, we must also take into account "any negative side effects" that Mr. Branham suffers "from the use of mitigating measures." *Sutton*, 527 U.S. at 484.

For Mr. Branham, these negative side effects are many. He is significantly restricted as to the manner in which he can eat as compared to the average person in the general population. His dietary intake is dictated by his diabetes, and must respond, with significant precision, to the blood sugar readings he takes four times a day. Depending upon the level of his blood sugar, Mr. Branham may have to eat immediately, may have to wait to eat, or may have to eat certain types of food. Even after the mitigating measures of his treatment regimen, he is never free to eat whatever he pleases because he risks both mild and severe bodily reactions if he disregards his blood sugar readings. He must adjust his diet to compensate for any greater exertion, stress, or illness that he experiences.

We must conclude that, on the record before us, a trier of fact rationally could determine that Mr. Branham's diabetes and the treatment regimen that he must follow substantially limit him in the major life activity of eating. Accordingly, we cannot accept the district court's determination that summary judgment was appropriate on the question of whether Mr. Branham is substantially limited in a major life activity.

**2.**

The district court also granted the IRS summary judgment on the question of whether Mr. Branham is an individual with a disability under the Rehabilitation Act because the

IRS regarded him as having an impairment which limited him substantially in one or more major life activities. *See* 29 U.S.C. § 705(20)(B)(iii). A plaintiff may prove that he is an individual with a disability under the "regarded as" prong of the Rehabilitation Act "by showing that either: 1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or 2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity." *Peters*, 311 F.3d at 843. On this record, we see no evidence that the IRS regarded Mr. Branham as disabled—that is, although the parties agree that diabetes is a physical impairment, there is no evidence that the IRS mistakenly believed that Mr. Branham's diabetes substantially limited him in one or more major life activities. Our cases make clear that "an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job." *Id.* Thus, summary judgment on the "regarded as" claim was properly granted.

### D. Otherwise Qualified

The Rehabilitation Act prohibits discrimination based solely on a person's disability, but it does not compel an employer entirely to disregard a person's disabilities. *See Knapp v. Northwestern Univ.*, 101 F.3d 473, 482 (7th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997). "[A]lthough a disability is not a permissible ground for assuming an inability to function in a particular context, the disability is not thrown out when considering if the person is qualified for the position sought." *Id.* (citing *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 405-06 (1979)).

The IRS contends it is entitled to summary judgment, regardless of Mr. Branham's status as an individual with a

disability because Mr. Branham poses a direct threat to the health or safety of others and therefore is not qualified for the position he seeks. Mr. Branham contends there is a genuine issue of material fact as to whether he is qualified for the position.

In order to determine whether an individual is qualified under the ADA standards, this court looks first at whether the individual "satisfies the prerequisites of the job, in terms of skills or experience"; second, the court considers whether the individual "can perform the essential functions of the job with or without a reasonable accommodation." *Peters*, 311 F.3d at 845; *see also Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000); 29 C.F.R. § 1630.2(m). The IRS does not dispute that Mr. Branham meets what it calls "the basic qualifications for the position." R.44 at 24. Rather, it contends that he cannot perform the essential functions of the job with or without a reasonable accommodation because his physical condition poses a risk of harm to himself and others.

In determining the essential functions of a job, we may consider, but are not limited to, "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before . . . interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3). We shall not second-guess an employer's judgment as to the essential functions of a job. *Peters*, 311 F.3d at 845.

The plaintiff in a Rehabilitation Act case or an ADA case generally bears the burden of proof on the question of whether he is qualified to perform the essential functions of a job with or without reasonable accommodation. *Bay*, 212 F.3d at 973. Because Mr. Branham, the nonmoving party with respect to the motion for summary judgment on the issue of qualification, would bear the burden of proof at

trial, he must "make a showing sufficient to establish the existence of [the] element essential" to his case—that is, that he can perform the essential functions of the job. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Upon examination of the record, we must conclude that Mr. Branham has raised a genuine issue of fact as to whether he can perform the essential functions of the criminal investigator position. Therefore, he survives the IRS' summary judgment motion.

In its motion for summary judgment, the IRS asserted that there will sometimes be a need for criminal investigators "to work irregular hours, respond to unanticipated requests, and react appropriately to an emergency or crisis." R.44 at 26. Mr. Branham, on the other hand, has offered his own testimony and that of his personal physician, Dr. Skierczynski, that he is able to work long hours and to deal with stress. Dr. Skierczynski, for instance, stated in an affidavit that he believed Mr. Branham would have no difficulty working long or irregular hours, reacting appropriately to a stressful crisis or emergency, and adapting to changing circumstances. R.53, Ex.4 at 4. Dr. Skierczynski also stated that he believed Mr. Branham would be able to perform the duties of a criminal investigator safely. R.53, Ex.4 at 4.

The real dispute between the parties seems to be not simply whether Mr. Branham can withstand the working conditions that may be imposed on a criminal investigator, but whether he can continue to function safely in those conditions. In fact, the only essential function of the position that appears to be in question is the specification, included in the qualification standards for the position, that provides that "[a]ny condition that would hinder full, efficient performance of the duties of these positions or that would cause the individual to be a hazard to himself/herself or to others is disqualifying." R.45, Attachment C-2 at 18. The IRS

submits that Mr. Branham cannot perform the essential functions of the criminal investigator position because Dr. Miller found that the demands of the job would place him at risk of "subtle and/or sudden incapacitation," which "would place the applicant and others (other Special Agents, the public) at an extreme risk of safety that would be unacceptable." R.45, Attachment C-10. The IRS contends that the working conditions that may be imposed on a criminal investigator would result in Mr. Branham becoming a safety threat.

This aspect of the qualification standards incorporates the "direct threat" defense that is part of the law of the ADA.[4] "Direct threat" has been defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). The key inquiry when considering whether an employee is a direct threat is "not . . . whether a risk exists, but whether it is significant." *Bragdon*, 524 U.S. at 649. The assessment of risk "must be based on medical or other objective evidence" and the

---

[4]  Title I of the ADA provides:

> (a) It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation . . . .

> (b) The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C. § 12113.

determination that a significant risk exists must be objectively reasonable. *Id.* at 649-50. A court considering the presence of a direct threat must take into account several characteristics of the harm allegedly posed by the individual with a disability. *See Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 287-88 (1987); *see also Bragdon*, 524 U.S. at 649 (ADA's direct threat provision and regulations codify *Arline*).

The parties disagree about whether Mr. Branham or the IRS bears the burden of proving or disproving that Mr. Branham is a direct threat; the IRS asserts it is Mr. Branham's responsibility to prove he is not a direct threat, and Mr. Branham alleges the IRS must prove as a defense that he is a direct threat. This court has stated that "it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation."[5] *Dadian v. Vill. of*

---

[5] We note that there is a dispute among the circuits regarding the burden of proof with respect to the question of whether an employee poses a direct threat to his own safety or that of others. Some circuits place the burden of proof on the defendant employer. *See, e.g.*, *Hutton v. Elf Atochem N. America, Inc.*, 273 F.3d 884, 893 (9th Cir. 2001) ("Because it is an affirmative defense, the employer bears the burden of proving that an employee constitutes a direct threat."); *EEOC v. Chrysler Corp.*, 917 F. Supp. 1164, 1171 (E.D. Mich. 1996) ("[I]t is defendant's burden to prove that [plaintiff] was in fact a 'direct threat.' "), *rev'd on other grounds*, No. 97-1793, 1998 WL 879589 (6th Cir. Nov. 25, 1998) (unpublished disposition). Other circuits place the burden of proof on the plaintiff employee, at least in some circumstances. *See, e.g.*, *McKenzie v. Benton*, No. 02-2084, 2004 WL 2526450, at *9 (10th Cir. Nov. 9, 2004) (plaintiff bears burden of proof on question of direct threat where "job qualifications . . . properly included the

(continued...)

---

[5] (...continued)
essential function of performing [plaintiff's] duties without en-dangering her co-workers or members of the public with whom she came in contact"); *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) ("[I]t is the plaintiff's burden to show that he or she can perform the essential functions . . . and is therefore 'qualified.' Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others."); *Moses v. American Non-Wovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) (per curiam) ("The employee retains at all times the burden of persuad-ing the jury . . . that he was not a direct threat . . . ."), *cert. denied*, 519 U.S. 1119 (1997). The Fifth Circuit has drawn a line some-where in between the two positions. *See Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 259-60 (5th Cir. 1999) ("[T]he burden of proof is on the plaintiff to prove that, as a qualified individual, she is not a direct threat to herself or others. . . . [W]hen a court finds that the safety requirements imposed tend to screen out the disabled, then the burden of proof shifts to the employer, to prove that the employee is, in fact, a direct threat."), *aff'd en banc*, 213 F.3d 209 (5th Cir. 2000) (holding defendant failed to preserve burden of proof issue for appeal), *and cert. denied*, 531 U.S. 958 (2000). Commentators have suggested that the confusion stems from the language of the ADA itself, since the statute includes the direct threat language in a section entitled "Defenses," which suggests it is an affirmative defense on which the defendant bears the burden of proof, but also classifies the direct threat analysis as a "qualification standard," which suggests that the plaintiff bears the burden of proving that he or she does not constitute a direct threat, as part of the burden to prove he or she is qualified. 42 U.S.C. § 12113. For further discussion, see, for instance, Jon L. Gillum, *Tort Law and the Americans With Disabilities Act: Assessing the Need for a Realign-ment*, 39 Idaho L. Rev. 531, 539, 565-67 (2003). We see no reason to revisit the established law of this circuit in this case. Our

(continued...)

*Wilmette*, 269 F.3d 831, 841 (7th Cir. 2001) (citing *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283-84 (7th Cir. 1995)). When the moving party will bear the burden of proof on an issue at trial, that party "must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party,' " in order to obtain summary judgment on the issue. *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) (quoting *Anderson*, 477 U.S. at 249). Thus, in order to prevail on its summary judgment motion asserting that Mr. Branham posed a direct threat to himself and others, the IRS must show that the evidence on the question of direct threat is so one-sided no reasonable jury could find for Mr. Branham. *See Anderson*, 477 U.S. at 251-52.

In order to determine whether Mr. Branham is a direct threat and therefore not qualified to perform the job of criminal investigator, we look to several factors including: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001); *see also* 29 C.F.R. § 1630.2(r). In light of these considerations, we must conclude that the record has created a genuine issue of triable fact as to whether Mr. Branham's physical condition presents a significant risk of substantial harm to himself or others.

---

[5]  (...continued)
earlier decision finds support in the plain wording of the statute and in common sense. The agency is certainly in the best position to furnish the court with a complete factual assessment of both the physical qualifications of the candidate and of the demands of the position. Here, the agency simply has not met that burden.

With respect to the question of the duration of the risk, the IRS provided testimony that Mr. Branham had experienced significant long term and short term changes in his blood glucose levels that it claims could affect his performance as a criminal investigator. Mr. Branham, on the other hand, contends that, although his diabetes cannot be cured, he can control the condition so effectively that there is no "real . . . duration of risk." R.42 at 12. Dr. Skierczynski, Mr. Branham's physician, testified that Mr. Branham tests his blood sugar levels several times a day, has exceptional control over his blood glucose levels and has "full awareness of all his reactions," allowing him to respond promptly to low blood sugar levels. R.53, Ex.4 at 4. Viewing the evidence, as we must, in the light most favorable to Mr. Branham, we believe that a reasonable trier of fact could conclude that the duration of any risk would not be significant.

With respect to the second factor under the direct threat analysis, the nature and severity of the risk, the IRS contends that drastic changes in Mr. Branham's blood sugar level could "significantly degrade his abilities to function as a special agent, potentially endangering Mr. Branham, his colleagues and the public." R.54 at 12. Mr. Branham argues that, although the risks of severe hypoglycemia can include incapacitation, confusion, coma and death, he never has lost consciousness and he never has experienced physical or mental incapacitation as a result of mild hypoglycemia. We emphasize that at this point, the summary judgment stage, we must view the facts in the light most favorable to the nonmoving party, in this case, Mr. Branham, and we must draw all inferences in his favor. A reasonable trier of fact could conclude that any hypoglycemia experienced by Mr. Branham will not impair him in the performance of his duties.

We turn to the third factor in the direct threat analysis, the likelihood of the potential harm. One of the IRS' experts, Dr. Cohen, an endocrinologist, found that the program of intensive treatment which Mr. Branham was following at the start of this case was "associated with increased risk" of severe hypoglycemia. R.45, Ex.E at 3. He also found that some of the job responsibilities of the criminal investigator "may increase" Mr. Branham's risk of experiencing severe hypoglycemia. R.45, Ex.E at 3. On the other hand, Dr. Skierczynski has testified in an affidavit that the risk of Mr. Branham suffering a severe hypoglycemic reaction was 0.2% per year. R.53, Ex.4 at 2. As Mr. Branham points out, the IRS has not presented any statistical evidence of the likelihood that the harm it fears will occur. In light of the evidence Mr. Branham has put forth, a reasonable jury could conclude that the likelihood of the harm that the IRS fears is quite low.

With respect to the fourth factor in the test, the imminence of the potential harm, Mr. Branham argues there is no evidence he poses an imminent threat, because he "has never suffered any period of incapacitation or other hypoglycemic episode and there is no medical evidence indicating that he will do so in the future." R.42 at 16. Furthermore, he cites several cases in which an at-work episode has preceded a court's finding that an employee was not qualified by reason of being a direct threat, *see, e.g., Emerson*, 256 F.3d at 514; *Hutton v. Elf Atochem N. America, Inc.*, 273 F.3d 884 (9th Cir. 2001), and argues that, because he has never suffered a severe hypoglycemic episode on the job, there is no indication he presents an imminent threat. The IRS simply responds that "such an assertion is not supported by logic." R.54 at 18.

We have no reason to determine whether an on-the-job incident is a prerequisite for finding that an employee pre-

sents an imminent risk of harm. However, Mr. Branham has put forth evidence that he does not present an imminent risk of harm. On this record, a reasonable trier of fact could conclude that Mr. Branham can prevent severe hypoglycemia from occurring by maintaining his treatment regimen and vigilantly testing his blood sugar levels, thereby allowing himself to calculate accurately how much insulin he should administer himself and how much and what type of food he will need to ingest. On this record, a reasonable trier of fact could conclude that this practice eliminates any imminence with respect to the risk of harm.

On the record in this case, a reasonable trier of fact could find that Mr. Branham is qualified for the position of criminal investigator. Therefore, we must conclude that the IRS is not entitled to summary judgment on the question of Mr. Branham's qualifications. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party"). Mr. Branham has raised a genuine issue of material fact as to whether he can perform the essential functions of the position of criminal investigator without becoming a threat to the safety of himself or others. On this record, the agency has not established otherwise.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion. Mr. Branham may recover his costs in this court.

REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*