# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued January 20, 2012        Decided April 13, 2012

No. 11-5017

JEFFREY KAPCHE,
APPELLANT/CROSS-APPELLEE

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES,
APPELLEE/CROSS-APPELLANT

―――――

Consolidated with 11-5018

―――――

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-2093)

―――――

*John W. Griffin, Jr.* argued the cause for the appellant/cross-appellee. *Katherine L. Butler* and *David Cashdan* were on brief.

*Michael A. Greene* was on brief for *amicus curiae* American Diabetes Association in support of the appellant/cross-appellee.

*Lindsey Powell*, Attorney, United States Department of Justice, argued the cause for the appellee/cross-appellant.

*Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, United States Attorney, and *Marleigh D. Dover*, Attorney, were on brief. *Anisha S. Dasgupta*, Attorney, United States Department of Justice, and *R. Craig Lawrence*, Assistant United States Attorney, entered appearances.

Before: HENDERSON, GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Jeffrey Kapche (Kapche) sued United States Attorney General Eric H. Holder, Jr. (Holder), alleging that the Federal Bureau of Investigation (FBI) refused to hire him as a special agent because of his Type 1 diabetes in violation of the Rehabilitation Act of 1973 (Act), 29 U.S.C. §§ 701 *et seq*. A jury found in favor of Kapche and awarded him $100,000 in compensatory damages. Subsequently, the district court denied both Holder's motion for judgment as a matter of law and Kapche's request for equitable relief. Kapche appeals the denial of equitable relief and Holder cross-appeals the denial of judgment as a matter of law. For the following reasons, we affirm the district court.

## I. Facts

Kapche is a Type 1 insulin-dependent diabetic who manages his condition by injecting himself with insulin several times daily and managing his diet, exercise and blood sugar. Kapche applied for a special agent position with the FBI in February 2002, and, in November 2004, the FBI offered Kapche a conditional offer of employment pending Kapche's successful completion of a medical examination and background investigation. On January 23, 2005, the FBI revoked Kapche's conditional offer because it determined he

could not adequately manage his diabetes and that consequently he would be unable to perform certain functions of a special agent. Kapche then filed an internal discrimination complaint alleging that the FBI declined to hire him because of his diabetes. The FBI and Kapche agreed to a settlement pursuant to which the FBI reinstated Kapche's conditional offer of employment and resumed processing his application.

As part of its reconsideration, the FBI conducted a Personnel Security Interview (PSI) with Kapche on November 22, 2006 during which Kapche represented that he had never been disciplined by a current or former employer. In a follow-up inquiry with his then-employer, the Fort Bend County (TX) Sheriff's Office (FBCSO), however, the FBI learned that the FBCSO had suspended Kapche for two weeks and placed him on 180 days' probation for unauthorized use of gasoline from FBCSO's gasoline tank in September 2005. After giving Kapche an opportunity to explain his omission during the PSI, the FBI concluded that Kapche's explanation varied from the explanation he had provided his FBCSO supervisors. Based on its conclusion, the FBI decided that Kapche was unsuitable for employment as a special agent because of a proven lack of candor and, on March 1, 2007, revoked his conditional offer of employment.

On March 14, 2007, Kapche filed a complaint under section 501 of the Act, 29 U.S.C. § 791(g), against then-Attorney General Alberto Gonzales challenging the FBI's January 2005 decision to revoke his conditional offer.[1]

---

[1] Kapche originally filed his complaint in the United States District Court for the Southern District of Texas but, on the defendant's motion, the case was transferred to the United States District Court for the District of Columbia. *See* Order at 10, *Kapche v. Gonzales*, No. 6:07-cv-0031 (S.D. Tex. Nov. 2, 2007).

Kapche argued that he was protected under the Act because his Type 1 diabetes substantially limited several of his major life activities, including eating and caring for himself, and was therefore a disability within the meaning of the Act. On May 20, 2009, a jury returned a verdict in Kapche's favor, finding that the FBI had unlawfully discriminated against him and awarding him $100,000 in compensatory damages.[2] Holder moved for judgment as a matter of law under Federal Rule of Civil Procedure 50, asserting that there was insufficient evidence to support the jury's determination that Kapche suffered from a disability. According to Holder, the evidence did not establish that Kapche's Type 1 diabetes substantially limited him in any major life activity. The district court denied the motion, concluding that Kapche produced sufficient evidence to support the jury's determination that "Kapche's Type 1 insulin-dependent diabetes substantially limit[ed] the manner in which he perform[ed] the major life activities of eating and caring for himself when compared to an average person in the general population." Mem. Order at 4, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Sept. 11, 2009) (brackets in original; internal quotation marks omitted).

The district court then considered what equitable relief, if any, Kapche was entitled to under the "make whole" rubric.[3]

---

[2] At a pre-trial hearing, the district court determined that the FBI's January 2005 revocation was the relevant employment action and that the FBI's "after-acquired reasons for not hiring [Kapche]" were relevant only with regard to the availability of equitable remedies. Tr. of Pretrial Conf. at 3-4, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Apr. 20, 2009). The district court accordingly excluded any evidence of Kapche's alleged lack of candor or of the underlying incident involving the FBCSO. *Id.*

[3] The Act borrows from Title VII of the Civil Rights Act of 1964 in setting out the remedies available for disability

After a hearing and briefing by the parties, the court denied Kapche's motion to preclude Holder from applying his after-acquired evidence defense to Kapche's request for equitable relief. It determined that Kapche was entitled to neither front pay nor instatement because Holder had presented after-acquired evidence that the FBI would have revoked Kapche's conditional offer of employment on March 1, 2007 regardless of his diabetes because of his proven lack of candor during his background investigation. As to back pay, the court accepted Holder's expert's testimony that Kapche earned more at the FBCSO than he would have earned as an FBI special agent between January 23, 2005 and March 1, 2007. The district court then ordered that final judgment be entered in Kapche's favor in the amount of $100,000 with costs.[4]

Kapche timely appealed as did Holder on cross-appeal. We turn to Holder's cross-appeal first and then address Kapche's appeal.

## II. Denial of Judgment as a Matter of Law

We review de novo the denial of a motion for judgment as a matter of a law but "[w]e do not . . . lightly disturb a jury verdict." *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 311 (D.C. Cir. 2009) (modifications in original; internal

---

discrimination. *See* 29 U.S.C. § 794a(a)(1); *infra* note 12. "[T]he purpose of Title VII [is] to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975).

[4] The district court also denied Kapche's motion to alter judgment pursuant to Federal Rule of Civil Procedure 59(e). *See* Order at 1-3, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Nov. 30, 2010). Kapche appealed this denial as well but he has forfeited the issue because he failed to pursue it in his opening brief. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (issue not argued in opening brief is "forfeited . . . on appeal").

quotation marks omitted). Judgment as a matter of law "is proper if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for' the nonmoving party." *Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43, 53 (D.C. Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)).

Section 501 of the Act, 29 U.S.C. § 791(g), prohibits federal agencies from discriminating in employment on the basis of a disability. At the time of the challenged discrimination, a disability was defined in relevant part as "a physical or mental impairment which substantially limits one or more . . . major life activities." 29 U.S.C. § 705(20)(B)(i) (2006); *see Desmond v. Mukasey*, 530 F.3d 944, 946 (D.C. Cir. 2008). In assessing Kapche's claim, the court employs the same standards used to determine liability under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12111 *et seq. See* 29 U.S.C. § 791(g);[5] *Desmond*, 530 F.3d at 952 (applying ADA employment discrimination standards to Rehabilitation Act claim). Holder does not dispute that Kapche's Type 1 diabetes is a "physical impairment" or that eating and caring for oneself are "major life activities."[6] He argues, however, that no reasonable jury

---

[5] 29 U.S.C. § 791(g) provides that "[t]he standards used to determine whether [Section 501] has been violated in a complaint alleging nonaffirmative action employment discrimination under [Section 501] shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment." 29 U.S.C. § 791(g).

[6] Other circuit courts have decided that eating is a major life activity. *See, e.g., Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010); *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652,

could have found that Kapche's Type 1 diabetes "substantially limits" his eating or caring for himself.

Determining whether an individual is substantially limited in a major life activity is an "individualized inquiry" and the effects—"both positive and negative"—of any measures "a person is taking . . . to correct for, or mitigate, a physical or mental impairment . . . must be taken into account when judging whether that person is 'substantially limited' in a major life activity." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 483 (1999).[7] "A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Id.* at 482. The plaintiff "must show that [his] limitation was substantial as compared to the average person in the general population," *Desmond*, 530 F.3d at 955 (internal quotation marks and citation omitted); however, an impairment need not cause an "utter inabilit[y]" to perform a major life activity in order for it to constitute a substantial limitation. *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998).

---

655 (5th Cir. 2003); *Fraser v. Goodale*, 342 F.3d 1032, 1039-40 (9th Cir. 2003); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424 (8th Cir. 1999); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999).

[7] Because the conduct at issue preceded the ADA Amendments Act of 2008, the pre-amendment standards to determine liability govern here. *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009) (ADA Amendments Act of 2008 does not apply retroactively). The 2008 Act provides, *inter alia*, that "the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." Pub. L. 110-325, 122 Stat. 3553, 3556 (2008) (codified at 42 U.S.C. § 12102(4)(E)(i)).

"The analysis of when and under what conditions diabetes is considered a disability for ADA purposes is a matter of degree." *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010) (internal quotation marks and citation omitted). Although we have not addressed whether Type 1 insulin-dependent diabetes substantially limits the major life activity of eating, we note that several sister circuits have done so. In *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004), the court concluded that a federal employee's Type 1 diabetes substantially limited his major life activity of eating because "[h]is dietary intake is dictated by his diabetes, and [he] must respond, with significant precision, to the blood sugar readings he takes four times a day." *Id.* at 903. Although the employee's treatment regimen kept his diabetes under control, the court emphasized that he "is never free to eat whatever he pleases because he risks both mild and severe bodily reactions if he disregards his blood sugar readings. He must adjust his diet to compensate for any greater exertion, stress, or illness that he experiences." *Id.* at 903-04. Likewise, in *Lawson v. CSX Transp., Inc.*, 245 F.3d 916 (7th Cir. 2001), the court concluded that a diabetic with "a perpetual, multi-faceted and demanding treatment regime" requiring "continued vigilance" was substantially limited in his ability to eat. *Id.* at 924 (internal quotation marks omitted). The plaintiff in *Lawson* took multiple blood tests daily and could not "simply eat when and where he wants to, or exert himself without concern for the effect the exertion will have on his glucose levels." *Id.* (internal quotation marks omitted).

On the other hand, in *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216 (5th Cir. 2011), the court concluded that "modest adjustments to . . . diet," namely "proportion control and not tak[ing] quick sugar-containing foods," and taking a "once-daily insulin shot" did not substantially limit a person's eating. *Id.* at 222-24 (brackets in original; internal quotation

marks omitted). In reaching its conclusion, the court also noted that "even when [the diabetic] makes mild deviations from his dietary plan, the consequences are not imminently dangerous." *Id.* at 223. Similarly, in *Scheerer v. Potter*, 443 F.3d 916 (7th Cir. 2006), the court held that the employee's diabetes did not substantially limit his eating where the "predominant purpose of his dietary restrictions was to lose weight" and the dietary restrictions were not "of the type of severe dietary restrictions that if not followed would lead to dire and immediate consequences." *Id.* at 920 (internal quotation marks and citation omitted); *see also Shultz v. Potter*, 142 F. App'x 598, 599 (3d Cir. 2005) (*per curiam*) (diabetes not substantially limiting because "condition has no significant effect on [diabetic's] diet: it merely requires her to watch what she eats more carefully, have a snack if her blood sugar is low, and take insulin if it becomes too high" (internal quotation marks and citation omitted)); *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1156 (11th Cir. 2005) (no substantial limitation on eating based on plaintiff's testimony that "with proper self monitoring, [he is] in no way limited by [his] diabetes in what [he] do[es] during the day or how [he] do[es] it").

Kapche's restrictions fall on the more limiting side of the spectrum. He takes insulin "every time [he] eat[s]," Tr. of Jury Trial at 539, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. May 13, 2009) (Trial Transcript), and checks his blood sugar level three to five times daily using a finger prick. Moreover, he must be "cognizant of what [he's] eating and how much [he's] eating." *Id.* at 541. Before eating anything, he must calculate the amount of carbohydrates he is about to ingest and adjust his insulin levels accordingly. And, while Kapche can eat or drink whatever he wants, he must constantly monitor and adjust his insulin levels and food intake to keep his blood sugar level within a safe range. Kapche must also adjust his insulin shots and food intake in

response to exercise and illness because of their effect on his blood sugar level. For example, when sick, Kapche may check his blood sugar level "eight or more times in a day . . . [to] make sure that it doesn't spike or . . . raise[][*sic*] too high." *Id*. at 543. As these measures suggest, Kapche's treatment regimen is "a constant battle every day." *Id*. at 540.

Kapche's medical expert, Dr. James Gavin (Gavin), also attested to the limitations that Kapche's diabetes and his treatment regimen place on his eating, stating that Kapche must "exercise constant vigilance on [his] blood sugar [level]." Trial Transcript at 474. As Gavin testified, "[Kapche] doesn't have the prerogative to simply eat what he wants when he wants. Everything has to be calculated and planned because everything has consequences." *Id*. at 465. Thus, if Kapche's "blood sugar is already very high, [he] ha[s] to wait" to eat until his blood sugar level drops. He "can't simply decide to [eat] because [he] feel[s] like doing it."[8] *Id*. at 470. Similarly, Kapche "doesn't have the luxury of simply engaging in physical activity, doing exercise, or participating in what might be strenuous leisure time activity without considering what the consequences could be." *Id*. at 465.

From this evidence, a jury could reasonably conclude that Kapche's diabetes and treatment regimen therefor "substantially limit[]" his major life activity of eating and that Kapche is therefore disabled within the meaning of the Act.[9]

---

[8]  "Consequences" of Type 1 diabetes include hypoglycemia (too low blood sugar) and hyperglycemia (too high blood sugar) as well as longer-term consequences such as heart disease, kidney disease, nerve disease and blindness. *See Branham*, 392 F.3d at 903.

[9]  Because of our conclusion regarding the major life activity of eating, we need not decide whether a jury could reasonably

Although Kapche's treatment regimen allows him to control his diabetes, the treatment regimen itself substantially limits his major life activity of eating. It "involves . . . the coordination of multifaceted factors [and] . . . constant vigilance" and he must "adhere strictly to [his] demanding regimen" "to avoid dire and immediate consequences." *Lawson*, 245 F.3d at 924-25; *see also Branham*, 392 F.3d at 903 ("Even after the mitigating measures of his treatment regimen, he is never free to eat whatever he pleases because he risks both mild and severe bodily reactions if he disregards his blood sugar readings."). Kapche "must always concern himself with the availability of food, the timing of when he eats, and the type and quantity of food he eats." *Lawson*, 245 F.3d at 924 (internal quotation marks and citation omitted). And "[h]e must adjust his diet to compensate for any greater exertion . . . or illness that he experiences." *Branham*, 392 F.3d at 903-04. "It is the severity of these limitations on his ability to eat that distinguishes [Kapche's] situation from that of other individuals who must follow the simple 'dietary restrictions' that medical conditions [like diabetes] sometimes entail."[10] *Lawson*, 245 F.3d at 924-25 (citation omitted). Accordingly, the district court did not err in denying Holder's motion for judgment as a matter of law.[11]

---

conclude that Kapche's diabetes treatment regimen also substantially limited his ability to care for himself.

[10] Some diabetics may have more severe eating limitations than Kapche, *see, e.g., Fraser v. Goodale*, 342 F.3d 1032, 1041-43 (9th Cir. 2003), but our inquiry focuses on whether Kapche's diabetes and control regimen substantially limit his eating "as compared to the average person in the general population." *Desmond*, 530 F.3d at 955 (internal quotation marks and citation omitted).

[11] Holder suggests that a finding of disability in this case is "tantamount to holding that Type 1 diabetics are disabled per se—a

Holder alleges other errors by the district court in denying his motion for judgment as a matter of law but they are without merit. First, as discussed *supra*, the record evidence sufficiently established that Kapche's diabetes and treatment regimen rendered him disabled within the meaning of the Act. Second, the district court properly considered Gavin's testimony that "Kapche is subject to a number of severe limitations in terms of his eating and the way he cares for himself." Trial Transcript at 465. Gavin's testimony did not constitute an impermissible legal conclusion because Gavin did not use terms that "have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (expert testimony that means of communication employed were not " 'as effective' " as means of communication with others constituted impermissible legal conclusion because phrase was "lifted directly from the text of the Attorney General regulations implementing the ADA" and "the phrase as used in the regulations is a term of art with a meaning 'separate' and 'distinct' from the vernacular" (internal citation omitted)). Read in context, Gavin simply gave his "opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied"; Gavin did not testify "as to whether the legal standard has been satisfied." *Id*. at 1212-13.

---

conclusion that is at odds with *Sutton* and the decisions of other circuits." Appellee's Br. 22. In *Sutton v. United Air Lines, Inc.*, *supra*, the United States Supreme Court observed that "[a] diabetic whose illness does not impair his or her daily activities" is not "disabled" under the ADA. *Sutton*, 527 U.S. at 483. Our holding today is consistent with this observation because, based on the individualized inquiry we must undertake to determine whether a person has a disability, Kapche's diabetes and treatment regimen *do* substantially "impair his . . . daily activit[y]" of eating. *Id.*

And third, in holding that Kapche produced sufficient evidence to establish that his treatment regimen substantially limited his eating, the district court did not err in noting the consequences of Kapche's failure to adhere to his treatment regimen. Although the holding in *Sutton*, *supra*, makes clear that a disability does not exist where an impairment " 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken," *Sutton*, 527 U.S. at 482, the district court did not rely on the consequences to conclude that Kapche's *diabetes* substantially limits his eating. Rather, the district court cited the consequences because they explain why Kapche must exercise vigilance in monitoring and controlling his diet, exercise and blood sugar and, consequently, why his *treatment regimen* substantially limits his eating. *See Branham*, 392 F.3d at 903 (noting consequences of failing to follow dietary restrictions to explain why diabetic "is never free to eat whatever he pleases").

### III. Denial of Equitable Relief

We turn to Kapche's appeal challenging the district court's denial of equitable relief. Kapche asserts that the district court erred in denying him front pay or instatement based on Holder's after-acquired evidence defense and in determining that Kapche was not entitled to back pay based on the testimony of Holder's expert witness.[12] We "review[] equitable relief, the standard for calculating back pay and

---

[12] Pursuant to section 505 of the Act, the district court is authorized to order the "hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g); *see* 29 U.S.C. § 794a(a)(1) (remedies for employment discrimination in violation of 29 U.S.C. § 791 include those "set forth in . . . 42 U.S.C. 2000e-5(f) through (k)").

front pay, under an abuse of discretion standard." *Peyton v. DiMario*, 287 F.3d 1121, 1125 (D.C. Cir. 2002). "A 'district court has wide discretion to award equitable relief,' " and it " 'should fashion this relief so as to provide a victim of employment discrimination the most complete make[-]whole relief possible.' " *Id.* at 1126 (quoting *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995)).

## *A. Front Pay / Reinstatement*

As to the denial of front pay or instatement, Kapche alleges that the district court committed several errors most of which relate to Holder's after-acquired evidence defense. Although evidence of the plaintiff's wrongdoing acquired subsequent to an employer's discriminatory hiring decision does not negate liability, it is relevant in determining whether equitable relief is available to the plaintiff. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360-63 (1995). "[A]s a general rule . . . , neither reinstatement nor front pay is an appropriate remedy" if the employer has after-acquired evidence of wrongdoing "of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362, 363. Kapche contends Holder did not timely raise the defense under Federal Rule of Civil Procedure 8(c) and did not sufficiently make out the defense even if timely raised. Finally, Kapche contends the district court abused its discretion with respect to several discovery rulings.

## 1.

Kapche first contends that Holder forfeited his after-acquired evidence defense by failing to plead it sufficiently under Rule 8(c), which provides that "[i]n responding to a pleading, a party must affirmatively state any . . . affirmative defense." Fed. R. Civ. P. 8(c)(1). "[I]t is well-settled that [a] party's failure to plead an affirmative defense . . . generally

results in the waiver of that defense and its exclusion from the case." *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997) (internal quotation marks omitted; emphasis removed). Rule 8(c) "gives the opposing party notice of the defense . . . and permits the party to develop in discovery and to argue before the District Court various responses to the affirmative defense." *Id*. We have not decided if the after-acquired evidence defense is an affirmative defense subject to Rule 8(c) and we need not do so here because, assuming *arguendo* that it is an affirmative defense, Holder's amended answer sufficiently alleged it.[13]

In his amended answer filed April 2, 2008, Holder averred that "[Kapche] was not appointed as a Special Agent for legitimate non-discriminatory reasons, and would not have been appointed as a Special Agent even in the absence of his diagnosis and treatment for Type 1 diabetes." Def.'s Am. Answer to Pl.'s First Am. Compl. at 2, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Apr. 2, 2008). Kapche argues that this averment is insufficient because his complaint related to the FBI's January 2005 decision to revoke Kapche's conditional offer of employment. The record makes clear, however, that Holder adequately asserted the after-acquired evidence defense with respect to the FBI's March 2007 decision to revoke Kapche's conditional offer because Kapche had "notice of the [defense], conducted discovery on the issue, and had ample opportunity to respond." *FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 189 (D.C. Cir. 2001); *see also Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 444 (D.C. Cir. 1994) ("The purpose of [Rule 8(c)] is to put

---

[13] Nor have we expressly decided whether a district court ruling on the timely assertion *vel non* of an affirmative defense is subject to de novo or abuse of discretion review. Again, we need not decide the standard here, however, because under either standard the district court did not err.

opposing parties on notice of affirmative defenses and to afford them the opportunity to respond to the defenses.").

One week before Kapche filed his complaint in this case, the FBI informed Kapche that it was withdrawing his conditional offer of employment because of his "failure to provide pertinent and accurate information during applicant processing." Letter from Bonnie Adams, Chief of Applicant Adjudication Unit, to Jeffrey Kapche at 1 (Mar. 1, 2007). Thus, when Holder alleged in his answer that the FBI had "legitimate non-discriminatory reasons" for not hiring Kapche, Kapche was already on notice of what those reasons were. Moreover, in his response to Kapche's first set of discovery requests, Holder argued that due to Kapche's "exhibited lack of candor during an FBI investigation in 2006, [Kapche] is no longer eligible to become an FBI agent or entitled to compensation as an FBI agent as of that date." Def.'s Resp. to Pl.'s First Set of Disc. Reqs. at 22, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Mar. 6 2008). In noticing Holder's deposition, Kapche declared his intent to depose Holder regarding the allegation and he later served a discovery request referencing the "FBI's guidelines for reviewing background investigations for special agent applicants." Pl.'s Second Set of Disc. Reqs. at 4, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. July 30, 2008) (Second Discovery Request). Kapche successfully excluded all testimony on the defense from the jury trial; the district court also afforded Kapche an opportunity in the form of briefing and a hearing to rebut the defense post-trial. Accordingly, Holder sufficiently asserted the after-acquired evidence defense. *See Nat'l Rifle Ass'n of Am.*, 254 F.3d at 189.

2.

Kapche next contends that the district court erred by allowing the after-acquired defense because Holder failed to demonstrate that the FBI's practice is to deny employment to

applicants who demonstrate a lack of candor. To establish the defense, Holder must demonstrate that the FBI "*would have* [revoked Kapche's conditional offer] because of the misconduct, not simply that it *could have* done so." *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 760 (D.C. Cir. 2000) (emphases in original); *see also Hartman Bros. Heating & Air Conditioning, Inc. v. NLRB*, 280 F.3d 1110, 1115 (7th Cir. 2002) (employer establishes after-acquired evidence defense "if . . . the employer unearths evidence that . . . would have caused him, without fault, to refuse to hire the employee"). To do so, Holder must establish "that [the FBI's] practice has been to dismiss employees for similar [conduct]." *Frazier Indus.*, 213 F.3d at 760. We conclude that Holder adequately established that (1) Kapche demonstrated a lack of candor during his background investigation regarding his suspension by the FBCSO and (2) the FBI's policy and practice is to refuse to hire an applicant for proven lack of candor.

According to his FBCSO personnel file, Kapche initially denied taking gasoline from the FBCSO gas tank without permission when confronted by his FBCSO supervisor but later admitted it and explained that he did so in case he and his family lost electricity during Hurricane Rita. In his second FBI interview, Kapche said he had not recalled the FBCSO incident at the November 2006 PSI and further that he understood any record of the incident had been removed from his FBCSO personnel file. He then explained that he took the gasoline for use in his vehicle in preparation for working long shifts due to Hurricane Rita. Tracy Johnson (Johnson), the FBI adjudicator responsible for recommending whether Kapche was suitable for employment, noted the inconsistent explanations Kapche gave the FBCSO and the FBI for why he took the gasoline without authorization. In a memorandum to Sharon Magargle (Magargle), a program manager in the FBI's Applicant Adjudication Unit, Johnson communicated her findings and recommended that the FBI

discontinue Kapche's application. *See* Kapche Adjudication Recommendation at 4 (Mar. 1, 2007) (Recommendation). Magargle reviewed and accepted Johnson's recommendation and subsequently revoked Kapche's conditional offer of employment. Magargle testified that the decision to revoke Kapche's conditional offer for a proven lack of candor "was a slam dunk" and "not a close call . . . at all." Tr. of Evidentiary Hearing at 234, 235, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Oct. 21, 2009) (Evidentiary Hearing). Bonnie Adams (Adams), who, as chief of the FBI's Applicant Adjudication Unit, is ultimately responsible for all unsuitability decisions, testified similarly that Kapche's proven lack of candor was "clear cut." *Id.* at 180. Accordingly, the district court did not err in finding that the FBI treated inconsistent representations like Kapche's as demonstrating lack of candor. *See Frazier Indus.*, 213 F.3d at 760.

The FBI's suitability guidelines used to determine whether an applicant is eligible for employment provide that "[d]eliberate omissions from or misrepresentations of facts" and "[m]isrepresentation of facts pertaining to derogatory information developed during current/previous background investigation" are "[i]ssues, absent mitigating circumstances, [that] *may* be disqualifying." FBI Application Adjudication Unit, Suitability Guidelines at 5 (2007) (emphasis in original). Although the guidelines indicate that the FBI's decision finding Kapche unsuitable for employment is a discretionary one, Holder also introduced evidence that the FBI's usual practice is not to hire an applicant for proven lack of candor. *See Frazier Indus.*, 213 F.3d at 760 (if policy gives employer "potential option" to dismiss employee for certain misconduct, employer must "provide[] . . . evidence that its practice has been to dismiss employees for similar [misconduct]"). Adams testified that "when a proven lack of candor is discovered, the applicants are deemed unsuitable for

FBI employment." Evidentiary Hearing at 132. Adams also stated that out of 800 unsuitability decisions made in 2007, about 100 were for "failure to provide pertinent and/or accurate information, or lack of candor." *Id.* at 153-54. Magargle also testified that, of the decisions she has made finding an applicant unsuitable for employment, "[t]he majority are [for] lack of candor." *Id.* at 234. The FBI's policy and practice makes sense in light of a special agent's position of public trust and because a "proven lack of candor" can affect a special agent's credibility in testifying on behalf of the government at trial. *See O'Day v. McDonell Douglas Helicopter Co.*, 79 F.3d 756, 762 (9th Cir. 1996) ("[O]ften the only proof an employer will have is . . . a company policy forbidding the conduct and the testimony of a company official that the conduct would have resulted in immediate discharge."); *id.* (in determining employer established it would have discharged employee, it is "significant" that company policy and testimony "is corroborated by . . . common sense").

Kapche introduced evidence that the FBI hired previously two applicants despite their lack of candor. In neither case, however, did the FBI determine that the applicant "deliberate[ly] omi[tted] and misrepresent[ed] . . . facts pertaining to derogatory information developed during his Background Investigation" as it did in Kapche's case. Recommendation at 4. Kapche's two examples involved instances of "reported lack of candor," not "proven lack of candor," and Adams's testimony makes clear that a report of misconduct not confirmed by the FBI's independent investigation is not a barrier to employment. In contrast, Kapche's case involved a "proven lack of candor" because the FBI's review of Kapche's FBCSO personnel file and Kapche's re-interview "prove[d] [Kapche was] being less than honest" about his previous misconduct. Evidentiary Hearing at 132. Accordingly, the district court did not err in

allowing Holder's after-acquired evidence defense because he adequately established that the FBI "would have terminated [Kapche's] employment for his misconduct." *Frazier Indus.*, 213 F.3d at 760.[14]

3.

Kapche also alleges that the district court erred in allowing Holder to use Magargle as a witness at the remedy hearing in violation of Federal Rule of Civil Procedure 37(c)(1) and in denying him additional discovery related to Johnson, Kapche's polygraph examination results and other matters relating to the after-acquired evidence defense. " 'We review district court rulings on discovery matters solely for abuse of discretion,' reversing only if the party challenging the decision can show it was 'clearly unreasonable, arbitrary, or fanciful.' " *Bowie v. Maddox*, 642 F.3d 1122, 1136 (D.C. Cir. 2011) (quoting *Charter Oil Co. v. Am. Emp'rs' Ins. Co.,* 69 F.3d 1160, 1171 (D.C. Cir.1995)).

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

---

[14] Kapche's claim that the after-acquired evidence defense is inapplicable because his misconduct arose as a result of the FBI's revocation of his initial offer is without merit. Kapche's misconduct—both taking the gasoline and, more importantly, his subsequent lack of candor to the FBI—was not "occasioned by" the revocation of his initial offer. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 555 (10th Cir. 1999). That is, the FBI's revocation of Kapche's conditional offer was not the proximate cause of Kapche's subsequent misconduct. *See id.* (no after-acquired evidence defense if "alleged misconduct arises as a *direct result* of [illegal] termination" (emphasis added)).

Fed. R. Civ. P. 37(c)(1). Rule 26(a) requires a party to disclose, *inter alia*, "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e)(1)(A) imposes a duty to supplement a Rule 26(a) disclosure but only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Although Holder did not include Magargle in his initial disclosure, her identity nevertheless became known to Kapche during discovery. Holder produced Johnson's memorandum to Magargle recommending that the FBI "discontinue[]" Kapche's application, Recommendation at 1; during Adams's deposition, Kapche's lawyer asked her questions about Magargle; and Kapche sought discovery of "[e]mails and documents from or to Sharon Magargle about Jeff Kapche." Second Discovery Request at 4. Also, at a pretrial hearing, the district court identified Magargle as a potential witness on "equitable issues." Tr. of Pretrial Conf. at 3, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Apr. 20, 2009). Because Magargle's identity was "made known" to Kapche, Holder had no obligation to supplement his disclosures pursuant to Rule 26(e)(1)(A) and therefore the district court did not err in allowing Magargle to testify at the equitable relief hearing.[15]

---

[15] Holder had no obligation to supplement his discovery disclosure regarding Johnson for the same reason, namely, Johnson's identity and related information were "made known" to Kapche during discovery. Holder produced Johnson's memo to Magargle and Kapche asked Adams questions about Johnson during Adams's deposition. Moreover, the district court did not err in denying Kapche's request to depose Johnson: Kapche's lawyer expressly disclaimed any interest in deposing Johnson for strategic reasons, fearing that her deposition would "supply a missing element of [Holder's] defense." Evidentiary Hearing at 295;

Fed. R. Civ. P. 37(c)(1); Fed. R. Civ. P. 26(e)(1)(A); *see also English v. Dist. of Columbia*, 651 F.3d 1, 13 (D.C. Cir. 2011) (no abuse of discretion in declining to strike testimony under Rule 37(c)(1) if "government's failure to supplement its disclosure was harmless").

Kapche's other discovery-related claims are also meritless. Although the district court did not allow Kapche access to the unredacted results of his polygraph examination conducted in December 2006, the district court reviewed the unredacted polygraph results *in camera* and determined they were immaterial to Holder's after-acquired evidence defense.[16] Mem. at 4 n.2, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. May 29, 2010) (May Memorandum); *see United States v. Sampol*, 636 F.2d 621, 682 (D.C. Cir. 1980) (*per curiam*) (no abuse of discretion where district court reviewed document *in camera* and "concluded that it contained nothing exculpatory, that there were no discrepancies between the affidavits and the contents of the file and that it was not material to the preparation of the defense"). As to the FBI's database of hiring records, we cannot say the district court abused its discretion in declining to draw an inference adverse to Holder for failing to produce the database given Kapche's failure to raise any claim

---

*cf. Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("[A]n attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from a judgment.").

[16] Kapche makes much of the fact that he "passed" a polygraph examination following his PSI in November 2006, indicating he never intended to deceive the FBI about the earlier disciplinary action. It does not appear, however, that Kapche was asked about his lack of candor during the polygraph examination and, as noted above, the court decided that the results were irrelevant to Holder's defense.

regarding the database. *See Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 266 n.1 (1998) ("[T]he decision of whether to draw an adverse inference has generally been held to be within the discretion of the fact finder.").[17]

### B. Back Pay

Finally, Kapche alleges that the district court erred in not awarding him back pay. In reviewing the district court's decision on the amount of back pay owed, we consider "whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied on an improper factor, and whether the reasons given reasonably support the conclusion." *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (internal quotation marks omitted). The appropriate measure of any back pay owed Kapche is "back[]pay from the date of the unlawful discharge to the date the new information was discovered." *McKennon*, 513 U.S. at 362. The district court determined that Kapche was entitled to back pay for the period from January 23, 2005—when the FBI revoked his first conditional offer—to March 1, 2007—when the FBI revoked his second conditional offer. The court awarded him no back pay, however, because it determined that Kapche earned more working for the FBCSO during that 26-month period than he would have earned as a special agent.

The district court credited the declaration of Holder's expert, William Carrington (Carrington), over Kapche's expert, Amy McCarthy (McCarthy), that Kapche earned more in salary and benefits during the relevant period working at the FBCSO than he would have earned in salary and benefits

---

[17] At the equitable relief hearing, Kapche's lawyer told the court he sought additional discovery only on issues relating to back pay and Kapche failed to identify the database in his post-hearing motion for further discovery.

as a special agent. Carrington calculated the net present value of the salary and benefits Kapche earned at the FBCSO and of the hypothetical salary and benefits he would have earned as a special agent.[18] Kapche's FBCSO retirement benefits had already vested but his FBI retirement benefits would *not* have vested during the relevant time period.[19] Consequently, Carrington included the vested retirement benefits in his calculation of Kapche's FBCSO salary and benefits and excluded the unvested retirement benefits in his calculation of Kapche's hypothetical FBI salary and benefits. In contrast, McCarthy *deferred* the value of Kapche's vested FBCSO retirement benefits but *included* the value of his unvested FBI retirement benefits in calculating back pay. In his second declaration, Carrington discussed the errors in McCarthy's calculation and the court noted that "[a]fter adjustment for [McCarthy's] errors, [McCarthy's] calculation would also result in a negative back pay figure." May Memorandum at 8. Kapche never contested Carrington's critique.[20]

Given the uncontested errors in McCarthy's calculations and Carrington's consistent use of a net present value

---

[18] Carrington calculated that Kapche made $11,934 more in his position with the FBCSO than he would have earned as a special agent. McCarthy calculated that Kapche would have made $38,871 more as a special agent than he earned with the FBCSO.

[19] Kapche's FBCSO retirement benefits were generous: he received a 2 for 1 match up to 7 per cent of his income and he was guaranteed a 7 per cent annual return. By contrast, Kapche acquired no retirement benefits as a special agent until he had worked for the federal government for five years. *See* 5 U.S.C. § 8410 (employee "must complete at least 5 years of civilian service" to be eligible for federal retirement benefits).

[20] Despite seeking leave to file a response (which Holder did not oppose), Kapche did not do so. *See* Pl.'s Mot. To Strike, *Kapche v. Holder*, No. 1:07-cv-2093 (D.D.C. Nov. 20, 2009).

methodology in calculating Kapche's salary and benefits, we conclude the district court did not abuse its discretion in denying back pay because it reasonably credited Carrington's back pay calculation. *See Downes v. Volkswagon of Am., Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994) (no abuse of discretion if front pay award "was based on appropriate evidence and reasonably informed estimates [by plaintiff's expert]" and defendant "never objected to [plaintiff's expert's] evidentiary submissions on the front pay issue"); *see also EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1276 (11th Cir. 2002) (no abuse of discretion in "crediting the back pay calculation of the EEOC's expert economist"); *Thomas v. Nat'l Football League Players Ass'n*, No. 96-7242, 1998 WL 1988451 at *9 (D.C. Cir. Feb. 25, 1998) (no abuse of discretion where district court "weigh[ed] expert testimony" to determine time period for which back pay was owed).

For the foregoing reasons, we affirm the district court's judgment denying Holder's motion for judgment as a matter of law and denying Kapche equitable relief.

*So ordered.*