# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 20-7117**

**September Term, 2021**

FILED ON: NOVEMBER 9, 2021

THEODORE WESBY, ET AL.,
  APPELLANTS

ANTOINETTE COLBERT, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ETHELBERT D. LOUIS,
  APPELLEE

v.

DISTRICT OF COLUMBIA, ET AL.,
  APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00501)

---

Before: TATEL, MILLETT and WALKER, *Circuit Judges*.

## J U D G M E N T

This case was considered on the record from the United States District Court for the District of Columbia, as well as on the briefs and oral arguments of the parties. We have accorded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). It is

**ORDERED AND ADJUDGED** that the order of the United States District Court for the District of Columbia be affirmed.

## I

The plaintiffs in this case are a group of individuals who attended a party at a house in Northeast Washington, D.C. in March 2008. *District of Columbia v. Wesby* (*Wesby III*), 138 S. Ct. 577, 583 (2018). In the early morning hours, the D.C. Metropolitan Police Department received a complaint about loud music and illegal activities at the house. *Id.* The caller informed

1

the police that the house had been vacant for several months. *Id.* Upon arrival, the police discovered a group of twenty-one men and women and a party well underway. *Id.* While the house had working electricity and plumbing, it was devoid of furniture except a few folding chairs and a bare mattress. *Id.*

The police interviewed the partygoers to piece together why they were at the house. *Wesby III*, 138 S. Ct. at 583. A couple of them explained that a woman named "Peaches" was renting the house and had invited them over. *Id.* Although Peaches was not present at the party, a partygoer called her so the police could speak with her. *Id.* Peaches said that she had just stepped away from the party to go to the store. *Id.* She refused to return to the house for fear of being arrested. *Id.* Initially, she insisted that she was renting the house and the partygoers were authorized to be there. *Id.* But when pressed, Peaches admitted that she did not have permission to use the house. *Id.* at 583–584. The officers called the owner, who stated that he was negotiating a lease with Peaches, but that the two had not yet come to an agreement. *Id.* at 584. The owner confirmed that Peaches did not have permission to be in the house, much less host a party there. *Id.*

The police arrested all twenty-one partygoers for unlawful entry, a charge that was later reduced to disorderly conduct. *Wesby III*, 138 S. Ct. at 584. The group was released after several hours, and the charges were eventually dropped. *Id.*

## II

### A

Sixteen of those partygoers (whom we shall call the "Attendees") sued the District of Columbia and five officers of the D.C. Metropolitan Police Department. The Attendees brought claims against the individual officers for false arrest under 42 U.S.C. § 1983 and D.C. law, and against the District for false arrest and negligent supervision under D.C. law. The Attendees' attorney was Gregory Lattimer of Lattimer Law, PLLC.

On cross-motions for summary judgment, the district court awarded partial summary judgment to the Attendees, sustaining the Section 1983 and common law false arrest claims against two of the officers and the negligent supervision claim against the District. *Wesby v. District of Columbia (Wesby I)*, 841 F. Supp. 2d 20, 24, 48–49 (D.D.C. 2012). More specifically, the district court ruled that, because the officers were aware that the Attendees believed they had Peaches' permission to be inside the house and nothing at the scene indicated otherwise, the officers lacked probable cause to arrest the Attendees for unlawful entry. *Id.* at 32–33. Nor was an arrest based on disorderly conduct justified, the court explained, because the officers' own testimony uniformly showed that they did not witness any disorderly conduct. *Id.* at 33–34. In addition, the court held that the officers had violated the Attendees' clearly established constitutional rights and were not entitled to qualified immunity. *Id.* at 37–39. The court concluded that the District itself was liable for negligent supervision because the supervising officers had breached the relevant standard of care by ordering the arrest of the Attendees. *Id.* at 47–48. After a damages-only trial, the jury awarded the Attendees $680,000 in compensatory damages.

2

**B**

This court affirmed. *Wesby v. District of Columbia* (*Wesby II*), 765 F.3d 13 (D.C. Cir. 2014). Shortly thereafter, the District moved this court to stay its mandate pending the District's petition for writ of certiorari to the Supreme Court. The Attendees opposed the motion, arguing that "[t]he only thing achieved by staying issuance of the mandate in this case is that the judgment need not be paid." Opp'n to Mot. to Stay the Mandate at 5, *Wesby II* (Feb. 22, 2016). They also claimed that the District was "unable to identify any **irreparable harm**" or "**any harm whatsoever**[] that [the District] would suffer as a result of the issuance of the mandate." *Id.* The court denied the District's motion and the mandate issued. Order Denying Mot. to Stay the Mandate, *Wesby II* (Feb. 25, 2016).

The Attendees then attempted to file a writ of attachment to secure payment of the judgment. Because the District is generally exempt from garnishment, the motion for a writ took aim at the personal assets of the two individual officers who had been held liable. *See generally Grunley Constr. Co. v. District of Columbia*, 704 A.2d 288, 290 (D.C. 1997) (addressing the District's general immunity from garnishment). The District subsequently agreed to pay the judgment in exchange for the Attendees withdrawing their request for a writ of attachment.

On May 19, 2016, the District satisfied the judgment by tendering a check for $685,003.27 to Lattimer Law (the sum of the $680,000 judgment and $5,003.27 in post-judgment interest). Lattimer set aside forty percent ($272,000) for his contingency fee payment and distributed the remainder among the Attendees based on their respective recoveries at trial.

Meanwhile, the District filed a petition for writ of certiorari in June 2016. In July, Lattimer emailed the Attendees to apprise them of the District's petition, telling them that the only significance of the petition for the Attendees was that they might be able to recover the attorney's fees deducted from their awards. J.A. 144 ("The significance of [the petition for certiorari] from your perspective, is the award of attorney's fees. If the decision of the Appellate Court is upheld, you will be entitled to recover the attorney's fees that you paid from your award.").

The Supreme Court granted the District's petition and, in January 2018, reversed. *Wesby III*, 138 S. Ct. at 582. The Court held that the officers had probable cause to arrest the Attendees for unlawful entry, *id.* at 582, 593, and that, in any event, the officers were entitled to qualified immunity, *id.* at 591, 593. Reasoning that the negligent supervision claim was predicated upon the Attendees' allegation that they were arrested without probable cause, the Court reversed the judgment against the District as well. *Id.* at 584, 593.

**C**

The District then filed a motion for restitution in the district court, seeking to recover the money it had paid in satisfaction of the court's judgment. Lattimer opposed the motion on behalf of himself (for the attorney's fees he had collected) and on behalf of the Attendees. A couple of

months later, however, Lattimer filed a motion to withdraw as counsel for the Attendees based on a purported conflict of interest between himself and his clients. The district court granted the motion to withdraw.

The court appointed pro bono counsel to represent the Attendees. That new counsel attempted to contact each of the Attendees, but was only able to reach nine out of the sixteen of them, and of those nine, only five provided declarations. All five declarations described how Lattimer barely communicated with the Attendees throughout the course of the litigation and never told them that the judgment could be reversed. The declarants also indicated that they were struggling financially and had spent the money they had received on things like rent, bills, and medical expenses.

The district court ordered Lattimer Law to repay the $272,000 it had received in legal fees, but declined to hold Lattimer personally liable. The court then referred the Attendees and the District to mediation. In preparing for mediation, counsel was able to collect financial statements from twelve of the Attendees. The statements revealed the Attendees' "dire financial situation[s][.]" J.A. 318. Many of the Attendees had modest income, if any, as well as significant debt and dependents. J.A. 328–391. The statements also confirmed that most, if not all, of the Attendees had spent their shares of the judgment on bills, rent, debt, and other pressing expenses. The efforts at mediation proved futile.

The district court then ruled that the Attendees had to pay full restitution to the District. The court first noted the legal basis for restitution in the circumstances of a reversed judgment. *See Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301, 309 (1935) ("[W]hat has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error."). The court explained, though, that restitution is an equitable remedy and so the District had to "show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." J.A. 406 (quoting *Atlantic Coast Line*, 295 U.S. at 309). The district court acknowledged the Attendees' arguments that they are "impoverished and could not afford to pay restitution if ordered[,]" and that because Lattimer failed to warn them about the possibility of reversal, the money was long since spent. J.A. 406. Nevertheless, the court explained, "the parties' personal circumstances play a diminished role in the unjust enrichment analysis when the original [judgment] payment was 'compelled by law [based on] a claim that is not legally enforceable.'" J.A. 406 (quoting RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 18 comment e (Am. Law. Inst. 2011)). The court then concluded that, "regardless of the parties' personal circumstances, a payment in satisfaction of a legally groundless judgment unjustly enriches the recipient and thus warrants restitution." J.A. 407.

The court also rejected the Attendees' change-of-position affirmative defense. Under that defense, "[i]f receipt of a benefit has led a recipient without notice to change position in such a manner that an obligation to make restitution of the original benefit would be inequitable to the recipient, the recipient's liability in restitution is to that extent reduced." RESTATEMENT (THIRD) § 65. The Attendees, though, "conced[ed] in their subsequent filings" that they did not change their financial positions in reliance on the judgment. J.A. 408. Instead, they spent their shares of

4

the judgment on "payments toward preexisting debt, necessary medical expenses, or food and rent"—payments the Attendees "would have made even if they had not received the [District's] money." J.A. 408.[1]

## III

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. The Attendees filed a timely notice of appeal, and this court has jurisdiction under 28 U.S.C. § 1291.

We review the legal issues underlying the district court's restitution award *de novo*. *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (citing *Peart v. District of Columbia Housing Auth.*, 972 A.2d 810, 814 (D.C. 2009)). We review the district court's ultimate decision to grant restitution for an abuse of discretion. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C. Cir. 1998).

## IV

## A

The Attendees' principal argument is that the district court erred as a matter of law by failing to consider all of the equities before awarding restitution. In particular, the Attendees assert that the district court neglected to take account of their dire financial circumstances and inability to pay back the judgment in determining whether restitution was warranted.

That argument fails because, whether or not the law required the district court to consider all of the equitable circumstances raised by the Attendees, the district court sufficiently accounted for them.

In its order, the district court recognized that the Attendees' "argument against restitution is an appeal to equity[,]" and it specifically acknowledged the Attendees' assertions that (i) "they are impoverished and could not afford to pay restitution if ordered[,]" and (ii) Lattimer failed to warn them that the judgment could be reversed and restitution granted, so "they spent the money long ago." J.A. 406. The court went on to explain that, nevertheless, "the parties' personal circumstances play a *diminished role* in the unjust enrichment analysis when the original [judgment] payment was 'compelled by law [based on] a claim that is not legally enforceable.'" J.A. 406 (emphasis added) (quoting RESTATEMENT (THIRD) § 18 cmt. e). Importantly, the district court did not accord the Attendees' financial circumstances "no role" in its equitable analysis— just a "diminished role[.]" J.A. 406.

The Attendees point to the district court's statement later in the judgment that, "regardless of the parties' personal circumstances, a payment in satisfaction of a legally groundless judgment unjustly enriches the recipient and thus warrants restitution." J.A. 407. All that sentence means

[1] The district court declined to order restitution from Ethelbert Louis because he died during the pendency of the proceedings, and the District conceded that it could not recover from his estate. J.A. 289 n.4, 405.

is that, while the court expressly considered the Attendees' financial circumstances, it concluded that they did not overcome the factors favoring restitution. After all, the court first ordered the parties to mediation "[h]aving taken into consideration the [parties'] arguments * * * as to the equities of restitution in the rather unique circumstances of this case[.]" J.A. 304. And after mediation failed, the court allowed the Attendees to file supplemental briefing further documenting their limited income and assets, significant debts and liabilities, and general inability to make restitution payments. If the court was of the view that the Attendees' financial circumstances were completely irrelevant to the restitution inquiry, it would not have taken those procedural steps.

**B**

The Attendees also argue that the district court committed legal error by failing to consider other affirmative defenses beyond the change-of-position defense. But the court was not obligated to consider those other defenses because they were not raised as affirmative defenses by the Attendees before the district court. The burden of pleading an affirmative defense falls on the party seeking to avail itself of the defense, not the court. *See Kapche v. Holder*, 677 F.3d 454, 465 (D.C. Cir. 2012) ("It is well-settled that a party's failure to plead an affirmative defense generally results in the waiver of that defense and its exclusion from the case.") (formatting modified) (quoting *Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997)); *see also* FED. R. CIV. P. 8(c); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1270 (3d ed. 2004).

**C**

Even taking into account the Attendees' personal circumstances and the alleged conduct of their attorney, the district court's decision to award restitution on this record was not an abuse of discretion.

First, the court properly concluded that restitution was appropriate because the Supreme Court's reversal of the original judgment erased any legally valid basis for liability. After all, the Court did not reverse for a mere procedural defect or another reason ancillary to the question of legal liability. Instead, the Supreme Court held that the Attendees' rights were not violated, and so they had no legal right to the damages payment. *Wesby III*, 138 S. Ct. at 589. This created "an important reason for restitution * * * independent of the individualized equities of the parties." J.A. 407 (quoting RESTATEMENT (THIRD) § 18 cmt. e).

Second, the Attendees opposed the District's motion for a stay of this court's mandate and "demanded payment pending appeal[.]" J.A 409. In so doing, the Attendees "assumed the risk that they might have to repay the [District] if the appeal went against them." J.A. 409. The Attendees themselves acknowledged in their opposition to the motion for a stay that "[t]he only thing achieved by staying issuance of the mandate in this case is that the judgment need not be paid." Opp'n to Mot. to Stay the Mandate at 5, *Wesby II* (Feb. 22, 2016). And they represented to this court that the District would not suffer any irreparable harm as a result of issuance of the mandate. *Id.*

In response, the Attendees point out that it was really their attorney, Lattimer, who opposed the stay and made those representations, and that Lattimer left them completely in the dark as to the course of the litigation. But the district court rightly noted that, "[u]nder our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." J.A. 409 (quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 92 (1990)) (internal quotation marks omitted). As such, Lattimer's assumption of the risks of both reversal and a claim for restitution falls equally on the Attendees.[2]

Third and finally, the district court did not abuse its discretion in holding that the Attendees failed to establish the change-of-position affirmative defense. The court acted within its discretion in accepting the Attendees' concession that they "did not change their financial positions in reliance upon receiving the judgment proceeds[.]" J.A. 408 (quoting J.A. 318). At argument here, Attendees' counsel confirmed that they intended to fully concede the change-of-position defense. *See* Oral Arg. Tr. 11:25–12:6 (Question: "Did you mean to concede the change-of-position defense, or did you have a different angle or theory of the change-of-position defense?" Answer: "No, Your Honor, we did concede the change-of-position defense quite simply because plaintiffs did not have the financial resources to change their position.").

## V

For all of those reasons, the judgment of the district court is affirmed.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

**Per Curiam**

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/
Michael C. McGrail
Deputy Clerk

---

[2] As the district court observed, the Attendees' recourse would be to file a malpractice claim against Lattimer and his law firm. J.A. 409 n.5 (also pointing out the three-year limitations period for such claims). The Attendees also have the option of filing a disciplinary complaint against Lattimer, which can, if warranted, result in restitution. *See* D.C. Bar Rule XI § 3(b). The record indicates that Lattimer has previously been suspended by the D.C. Bar for violating the Rules of Professional Conduct in his representation of other clients. J.A. 316, 325.